**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

TERRI BARTOS,

        Plaintiff,

                                              Case No. 17-11059

v.

UNITED STATESOF AMERICA,

        Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Terri Bartos brings this negligence action against Defendant United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiff alleges that she sustained injuries in a motor vehicle accident with a United States Postal Service vehicle. Now before the court is Defendant's motion for summary judgment. (Dkt. # 23.) The matter is fully briefed, and no hearing is needed. *See* E.D. Mich. LR 7.1(f)(2). Plaintiff cannot maintain a claim for economic damages under the applicable law—Michigan's No Fault Act—so the court will grant Defendant's motion as to those damages. And because Plaintiff's evidence fails to establish a genuine dispute of material fact as to a serious impairment of a body function, the court will grant Defendant's motion with respect to Plaintiff's claim for non-economic damages as well.

## I. BACKGROUND

### A. The Accident

On March 9, 2016, while Plaintiff was driving her vehicle in Oakland County, Michigan, she was involved in a collision with a United States Postal Service ("USPS")

vehicle driven by Elizabeth Thompson, who was acting within the scope and course of her employment with USPS at the time. (Dkt. # 1, Pg. ID 4.) Neither party contests that Thompson was at fault in the collision. Plaintiff was shaky and had chest pain following the accident, but she did not go to the hospital or seek medical attention on the day of the accident because she "wasn't bleeding." (Dkt. # 22-1, Pg. ID 148.)

### B. Plaintiff's Work History

Plaintiff is employed at the General Motors ("GM") plant in Flint, Michigan and works on the assembly line, which requires her to perform physical labor. Plaintiff is sixty years old and has worked on an assembly line for more than fifteen years. Plaintiff typically works from three in the afternoon to eleven at night, five to six days a week. (Dkt. # 22-1, Pg. ID 126.) Between 2012 and 2016, Plaintiff changed jobs within the plant numerous times. (Dkt. # 22-1, Pg. ID 122.)

Plaintiff's first job at the GM plant consisted of "putting the seals around the inside of the door." She held this position until 2013, when she took disability leave from work for approximately eight months for a variety of medical issues including chest, lumbar, and leg pain. (Dkt. # 22-1, Pg. ID 131-132.) Plaintiff's next job was on the instrument panel ("IP"). She switched from seals to the IP because she no longer could physically maintain the pace of work required for the seals process. (Dkt. # 22-1, Pg. ID 123.) Plaintiff worked on the IP from approximately 2013 to 2014. (*Id.*) Plaintiff took disability leave again in 2014 for similar medical issues as those she took leave for in 2013. (Dkt. # 22-5, Pg. ID 189.) After working on the IP, Plaintiff transferred to the box line. Plaintiff moved to the box line because it was an easier and slower paced job than the IP. (Dkt. # 22-1, Pg. ID 125.) In 2015, Plaintiff took disability leave for knee pain.

(Dkt. # 22-7, Pg. ID 207.) In mid-2016, after the accident, Plaintiff transferred to her current job, the door line. (Dkt. # 22-1, Pg. ID 127.) To Plaintiff, the door line is faster paced work than the box line. (Dkt. # 22-1, Pg. ID 128.)

Throughout Plaintiff's time working at the GM plant, she filed several other claims for disability leave between 2006 and 2016 for various medical issues. These medical issues rendered Plaintiff unable to work on several occasions before the accident.

### C. Plaintiff's Pre-Accident Medical History

Since as early as 2006, Plaintiff suffered from numerous medical issues including chest pain, bladder issues, low-back pain, and knee pain.

Plaintiff has experienced low-back pain since 2006 and it continues to "come and go." (Dkt. # 22-1, Pg. ID 134.) More specifically, Plaintiff's sciatic nerve causes her pain; she describes it as a "burning, stabbing pain." (Dkt. # 22-1 Pg. ID 134.) Plaintiff has tried exercises, physical therapy, and injections of medication in order to lessen her low-back pain. (Dkt. # 22-1, Pg. ID 134-135.) Plaintiff has been receiving treatment for her back from an orthopedist, Dr. Lininger, since approximately October 2014. (Dkt. # 22-1, Pg. ID 154.) Dr. Lininger administers injections of pain medication into Plaintiff's back and spinal nerves. (*Id.*)

Based on the records from Plaintiff's GM disability leave claims, she began experiencing chest pain in 2013. Plaintiff described her chest pain as being as painful as a heart attack at that time, and that it caused her to sweat and experience shortness of breath. (Dkt. # 22-1, Pg. ID 133.)

Plaintiff has a bladder issue that began in 2014 when her bladder "fell out."[1] (Dkt. # 22-1, Pg. ID 136.) Plaintiff also has a neurogenic bladder, meaning "she was having trouble emptying it and she was having pain." (Dkt. # 32-1, Pg. ID 531.) Plaintiff had surgery to repair her bladder, which rendered her unable to work for approximately six to eight weeks. (Dkt. # 22-1, Pg. ID 136.)

Plaintiff also suffers from knee issues. She has torn her meniscus three times; the first time occurred in January 2015. (Dkt. # 22-1, Pg. ID 137.) At that time, Plaintiff had surgery to repair her knee; however, she tore her meniscus for the second time about a year later. (Dkt. # 22-1, Pg. ID 138.) On March 7, 2016, two days before the accident, Plaintiff filed a claim for extended disability benefits with GM because she tore her meniscus for the third time. (Dkt. # 22-1, Pg. ID 139.) Due to her knee problems, Plaintiff had pain walking and working. (Dkt. # 22-1, Pg. ID 140.)

On the day of the accident, approximately five hours before it occurred, Plaintiff visited her primary care physician, Dr. James Stepanski, to discuss her back and knee pain. (Dkt. # 22-1, Pg. ID 143.) Additionally, Plaintiff's bladder had fallen out again. (Dkt. # 22-1, Pg. ID 146.) During this visit to Dr. Stepanksi, Plaintiff planned to request a medical notice from Dr. Stepanski that would allow her to take approximately a month of sick leave from work. (Dkt. # 22-1, Pg. ID 147.) Plaintiff's medical issues prevented her from sitting for more than three hours, lifting or carrying more than ten pounds, and standing or walking for more than three hours. They also limited her ability to push, pull, climb, bend, stoop, and reach above her shoulders. (Dkt. # 22-10, Pg. ID 218.)

---

[1] Plaintiff has a prolapsed bladder. (Dkt. # 32-1, Pg. ID 532.) A bladder becomes prolapsed when the wall supporting the bladder weakens or loosens over time, and if it deteriorates enough, the bladder can descend or "fall" into the vagina.

Throughout this time, Plaintiff was taking opioid medication three to four times a day for her pain. (Dkt. # 22-1, Pg. ID 144-145.)

### D. Plaintiff's Post-Accident Medical History

A week after the accident, Plaintiff visited Dr. Stepanksi. During her visit she complained of chest pain and bruising on her arms. (Dkt. # 22-11, Pg. ID 220.) Dr. Stepanski ordered an X-Ray of Plaintiff's chest, which did not show any abnormalities. (Dkt. # 22-11, Pg. ID 220.) Plaintiff told Dr. Stepanski that she was suffering from upper-back pain between her shoulders because of the accident.

About a month after the accident, on April 4, 2016, Plaintiff submitted a claim to GM to extend her disability leave. In Dr. Stepanski's medical notice to GM, he stated that Plaintiff's leave should be extended due to her chest, knee, and lumbar spine pain. (Dkt. # 22-12, Pg. ID 223.) On April 6, 2016, a bone scan of Plaintiff's sternum revealed that she may have had a sternum fracture and if so, the fracture could have been the source of her chest pain. (*See* Dkt. # 22-13, Pg. ID 228) (The scan was diagnosed as "suspicious for fracture.").

About four months after the accident, on July 27, 2016, Plaintiff visited Dr. Lininger for treatment of her upper-back pain. (Dkt. # 22-1, Pg. ID 155.) Plaintiff indicated that her back pain was a one out of ten and she described the pain as, "like I needed my back cracked." (Dkt. # 22-1, Pg. ID 155.) Plaintiff also stated that a pain score of one out of ten meant she "wasn't in any pain." (Dkt. # 22-1, Pg. ID 156.) Plaintiff's chest pain was also less painful and not causing any issues. (Dkt. # 22-15, Pg. ID 235.) Additionally, Plaintiff was able to do activities such as bathing, cooking,

dressing, driving, and housekeeping without assistance. Plaintiff explained that, "[a]s long as there is no heavy lifting, I can do everything." (Dkt. # 22-1, Pg. ID 157.)

In September of 2016, Plaintiff completed her physical therapy program for her back and chest, and at the time of discharge, Plaintiff's condition was listed as "fair to good." (Dkt. # 22-1, Pg. ID 165.) According to the physical therapy record, Plaintiff's functionality level and ability to reach, push, pull, and bend was 85%. (Dkt. # 22-16, Pg. ID 236.) Plaintiff was able to return to work at that time and has continued to work. With her medication, Plaintiff is able to complete the activities required by her job uninhibited by her medical conditions. (Dkt. # 22-1, Pg. ID 167.)

### E. Procedural History

Plaintiff filed this complaint against Defendant, the United States government, on April 4, 2017 alleging negligence and seeking damages pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2674, for her injuries related to the March 9, 2016 accident.

Defendant filed a motion for summary judgment arguing that Plaintiff has not suffered a serious impairment of a body function as a result of the accident, as is required to maintain a claim under Michigan law. *See* Mich. Comp. Laws. § 500.3135(1).

### II. STANDARD OF REVIEW

A party is entitled to summary judgment if he shows that there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, the court considers "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v.*

6

*Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). The evidence and all reasonable inferences drawn from it must be considered in the light most favorable to the nonmoving party. *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). If the evidence is such that a reasonable jury could return a verdict for the nonmoving party, a genuine dispute of material fact exists. *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 391 (6th Cir. 2017).

The movant has the initial burden of establishing the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, this initial burden may be overcome by showing "that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). The burden then shifts to the nonmoving party, who must put forth enough evidence to raise a genuine issue of material fact for trial. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Celotex Corp.*, 477 U.S. at 324). Summary judgment is not appropriate if there exists a genuine dispute regarding a material fact; a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248.

The existence of a factual dispute alone does not, however, defeat a properly supported motion for summary judgment. Instead, the disputed factual issue must be material. A fact is "material" for purposes of summary judgment when proof of that fact would establish or refute an essential element of the claim "and would affect the application of the governing law to the rights of the parties." *Rachells v. Cingular Wireless Employee Servs., LLC*, 732 F.3d 652, 660 (6th Cir. 2013). A "mere 'scintilla' of evidence" supporting the nonmoving party's position will be insufficient to defeat

summary judgment. *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012)

(quoting *Liberty Lobby*, 477 U.S. at 252).

## III. DISCUSSION

### A. Federal Tort Claims Act

The Federal Tort Claims Act ("FTCA") allows the government to be held liable for

> injury or loss of property, or personal injury or death caused by the
> *negligent or wrongful act or omission* of any employee of the Government
> while acting within the scope of his office or employment, under
> circumstances where the United States, *if a private person, would be*
> *liable to the claimant in accordance with the law of the place where the act*
> *or omission occurred.*

28 U.S.C.A. § 1346(b)(1) (emphasis added). "An absolute prerequisite to maintaining an

action against the United States is a specific waiver of sovereign immunity." *Westfield*

*Co. v. United States*, 858 F. Supp. 658, 663 (W.D. Mich. 1993). The FTCA was

designed to "remove the sovereign immunity of the United States from suits in tort and,

with certain specific exceptions, to render the government liable in tort as a private

individual would be under like circumstances." *Richards v. United States*, 369 U.S. 1, 6

(1962). Waiving this sovereign immunity for certain actions in tort gives district courts

exclusive jurisdiction over those types of civil actions. *Premo v. United States*, 599 F.3d

540, 544 (6th Cir. 2010). The FTCA does not create a cause of action against the

United States, nor does it provide a method of enforcing federal statutory duties; rather,

the Act constitutes consent to suit and is limited to suits in which a private individual

would be held liable under like circumstances. *Premo*, 599 F.3d at 544.

By including the language, "negligent or wrongful act or omission of any

employee of the government," the FTCA provides a uniform federal limitation on the

types of acts committed by federal employees of which the United States has consented

to be sued. *Id.* at 548 (*citing Liard v. Nelms*, 406 U.S. 797, 799 (1972)). The Act itself "precludes the imposition of liability if there has been no negligence or other form of 'misfeasance or nonfeasance.'" *Liard*, 406 U.S. at 799. Accordingly, the waiver of sovereign immunity does not apply to claims grounded in strict liability; in other words, the United States is not liable for strict liability claims under the FTCA. *Premo*, 599 F.3d at 548.

The FTCA "was not patterned to operate with complete independence from the principles of law developed in the common law." *Richards*, 369 U.S. at 6-7. The government's liability under the FTCA is determined "in accordance with the law of the place" where the negligent or wrongful act or omission occurred. 28 U.S.C. § 1346(b)(1). Therefore, the government is liable only to the extent a private person in like circumstances would be held liable under state law. Since the accident in this case occurred in Michigan, the court will apply Michigan law.

### B. Michigan No-Fault Act

Here, Plaintiff seeks damages for injuries allegedly resulting from Defendant's negligent operation of a motor vehicle. (Dkt. # 1, Pg. ID 6-7.) In Michigan, liability for the operation of a motor vehicle is governed by the No-Fault Act. *McCormick v. Carrier*, 795 N.W.2d 517, 547 (Mich. 2010). In enacting the No-Fault Act, the Michigan Legislature abolished "tort liability arising from the ownership, maintenance, or use within [Michigan] of a motor vehicle," except as to: (a) intentionally caused harm to persons or property, (b) damages for noneconomic loss under certain circumstances, (c) damages for allowable expenses, work loss, and survivor's loss in excess of the daily, monthly, and 3-year limitations in the Act, (d) damages for economic loss by a nonresident in excess

of the personal protection insurance benefits provided under the Act, and (e) damages up to $1000.00 to motor vehicles, to the extent such damages are not covered by insurance. Mich. Comp. Laws. § 500.3135(3).

The Act replaced common law tort liability with a statutory priority scheme that allows an injured individual to recover first from his own insurance if applicable. Mich. Comp. Laws § 500.3114(1). If the individual is under or uninsured, then he may seek recovery from the insurer of the owner of the vehicle he occupied during the accident or the insurer of the operator of the vehicle he occupied during the accident. Mich. Comp. Laws § 500.3114(4). If none of those sources of recovery are available, the individual may seek benefits from the State of Michigan's assigned claims plan. Mich. Comp. Laws § 500.3172(1). Therefore, there is no common law cause of action for the negligent operation of a motor vehicle in Michigan. Consequently, Defendant has construed Plaintiff's common law negligence claim as a statutory claim under the No-Fault Act. The court will do so as well.

## C. Economic Damages

To the extent Plaintiff is seeking economic damages for her injuries from the motor vehicle accident,[2] the FTCA is inapplicable to her claim for two reasons: (1) Michigan law does not recognize a cause of action against a private *third-party* insurer for economic damages arising out of the use or operation of a motor vehicle; and (2) Michigan law states that a cause of action against a private insurer for economic

---

[2] The precise nature of Plaintiff's claims and the recover sought is unclear based on the generalized pleadings contained in Plaintiff's complaint. Construing the allegations in the complaint in the light most favorable to Plaintiff, the court will interpret Plaintiff's claims broadly.

damages arising out of the use or operation of a motor vehicle is a strict liability statutory claim, not a negligence action.

As explained above, the FTCA permits a finding of liability against the federal government only to the extent a private actor under like circumstances would be held liable under the applicable state law. The Michigan No-Fault Act abolished claims for economic damages against third-party insurers and instead directs individuals to their personal injury protection ("PIP") insurance benefit providers for recovery under such claims. Mich. Comp Laws § 500.3135. When an individual does not have a PIP insurer or is only partially insured, he may seek recovery of economic losses from several other insurers, namely those of the driver and/or owner of the vehicle which he occupied during the accident. Mich. Comp. Laws § 500.3114(4).

Defendant is not one of the insurers listed in the statute's priority scheme for recovery of economic benefits. Rather, Defendant is the owner of the vehicle which collided with Plaintiff's car. Consequently, even if Defendant were a private actor, it would not "be liable to [Plaintiff] in accordance with the law of [Michigan]," 28 U.S.C. § 1346(b)(1), because the Michigan No-Fault Act does not permit Plaintiff to recover economic damages from a third-party vehicle insurer or owner such as Defendant. Because there is no basis for liability under Michigan law, the FTCA is inapplicable and for the same reasons Plaintiff's independent state law claim fails as a matter of law. Therefore, the court will grant Defendant's motion for summary judgment as to Plaintiff's claim for economic damages.

Since the FTCA's application to the Michigan No-Fault Act is still a developing area of the law, the court finds it worth noting that there is another defect in Plaintiff's

claim for economic damages brought pursuant to the FTCA. The FTCA permits an individual to bring suit against the government to collect damages only for the government's negligent or wrongful conduct. Under the Michigan No-Fault Act, economic losses arising from motor vehicle accidents are recoverable through PIP insurance benefits "without regard to fault." Mich. Comp. Laws. § 500.3105(2). Thus, "Michigan law imposes strict liability for economic damages in motor vehicle accident cases," *Premo v. United States*, 599 F.3d 540, 548 (6th Cir. 2010); however, the FTCA does not waive the government's immunity from liability for claims grounded in strict liability. Because the Michigan No-Fault Act imposes strict liability for economic damages, i.e., liability without regard to whether the private actor was negligent, the FTCA does not grant a waiver of sovereign immunity for such claims against the government no matter whether the government is a third-party insurer or is an insurer within the priority chain of PIP insurers listed in the statute. *Id.* at 548. Accordingly, the FTCA is inapplicable to any strict liability claim for economic damages under the Michigan No-Fault Act, including Plaintiff's claim against Defendant.

### D. Noneconomic Damages

Plaintiff is also seeking noneconomic damages for her pain and suffering, fright and shock, and emotional distress.[3] (Dkt. # 1, Pg. ID 7.) In Michigan, "[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership,

---

[3] While the court has organized its analysis in terms of assessing economic and noneconomic damages, it recognizes that the Michigan No-Fault Act permits the recovery of certain "excess" economic damages under the same circumstances as noneconomic damages. For purposes of the court's analysis, the court includes those "excess" economic damages in its assessment of noneconomic damages because they are subject to the same standard of recovery under the Act. Mich. Comp. Laws § 500.3135(1) & (3)(c).

maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement." Mich. Comp. Laws. § 500.3135(1). Neither party argues that Plaintiff suffered death or that she suffered a permanent serious disfigurement.[4] Plaintiff bases her claim on an alleged serious impairment of body function. Defendant argues that Plaintiff has not suffered a serious impairment of body function as a result of the motor vehicle accident.

When interpreting a state statute, the court applies the law established by the state's highest court. *See Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 544 (6th Cir. 2012). In determining whether a plaintiff has suffered a serious impairment of body function pursuant to the No-Fault Act, the Michigan Supreme Court has held that, to begin:

> The court should determine whether there is a factual dispute regarding the nature and extent of the person's injuries, and, if so, whether the dispute is material to determining whether the serious impairment of body function threshold is met. If there is no factual dispute, or no material factual dispute, then whether the threshold is met is a question of law for the court.

*McCormick v. Carrier*, 795 N.W.2d 517, 537 (Mich. 2010) (citation omitted). If the court concludes there is no material factual dispute concerning the nature and extent of a person's injuries, it then determines if the serious impairment threshold has been crossed. *Id.*

The Act defines the term "serious impairment of body function" to mean "an objectively manifested impairment of an important body function that affects the

---

[4] Plaintiff's conclusory and unsupported statement that she has suffered a "[p]otential permanent serious disfigurement" is insufficient and any claim on this basis is deemed abandoned. (Dkt. # 1, Pg. ID 7, 11.)

person's general ability to lead his or her normal life." Mich. Comp. Laws § 500.3135(5). The No-Fault Act provides three factors that the plaintiff must prove in order to establish a "serious impairment of body function": (1) an objectively manifested impairment, (2) of an important body function that, (3) affects the person's general ability to lead his or her normal life. *Id.* Here, only the first and third factors are at issue because no one disputes that Plaintiff's alleged impairment concerns an important body function.

### 1. Plaintiff suffers from an objectively manifested impairment

To meet the threshold to demonstrate a "serious impairment of a body function," a plaintiff must first establish that she suffers from an objectively manifested impairment of body function. The proper inquiry for the court is "whether the *impairment* is objectively manifested, not the *injury* or its symptoms," *McCormick v. Carrier*, 795 N.W.2d 517, 527 (Mich. 2010) (emphasis in original), because the statute does not contain the word "injury," only the word "impairment." An injury is the actual damage or wound to a body, where as an impairment relates to the effect of that damage. *Id.* Therefore, when assessing the impairment, the focus is not on the injury or injuries themselves, but rather, on how the particular injuries affect the person's body function. *Id.* The Michigan Supreme Court has held that an "objectively manifested" impairment is one that is evidenced by actual symptoms or conditions, commonly understood as an impairment that is observable or perceivable by others from such symptoms or conditions. *Id.*

The parties purport to dispute whether the first factor is established; however, in actuality the parties' arguments all concern whether the accident caused Plaintiff's impairment. The record reflects no dispute over whether Plaintiff suffers from an

objectively manifested impairment of body function. Plaintiff's medical and employment records following the accident are clear and undisputed. They establish a number of objectively manifested impairments related to medical issues with Plaintiff's chest, back, and bladder. The question the parties truly dispute—whether the accident caused these impairments—is not one that this court needs to address because, as explained below, Plaintiff has failed to establish the third factor to meet the threshold to show a serious impairment of a body function. Namely, Plaintiff has not shown that her impairments have affected her general ability to lead her normal life.

## 2. Plaintiff has not shown that her impairments have affected her general ability to lead her normal life

The third factor to meet the threshold for a serious impairment of a body function requires a plaintiff to show that the impairment "affects the person's general ability to lead his or her normal life." Mich. Comp. Laws § 500.3135(5). The unambiguous text of the statute establishes that this assessment is subjective and personal to each plaintiff because it uses the pronouns "his or her" to modify "normal life" rather than the article "a." The Michigan Supreme Court has held that the third factor is a subjective, person, and fact specific inquiry that must be decided on a case by case basis. *McCormick v. Carrier*, 795 N.W.2d 517, 530 (Mich. 2010). Specifically, this inquiry requires a comparison of the plaintiff's life before and after the accident in order to determine how the impairment has affected the plaintiff's ability to engage in his normal manner of living. *Id.* To fulfill the third factor, there must be an influence on the plaintiff's capacity to live in his or her normal manner of living. *Id.* As the Michigan Supreme Court has explained, "the extent to which a person's general ability to live his or her normal life is

affected by an impairment is undoubtedly related to what the person's normal manner of living is." *Id*.

Defendant argues that any impairment Plaintiff suffered in the accident has not affected her general ability to lead her normal life. Plaintiff counters and argues that her ability to lead her normal life has been impaired by the injuries she sustained in the accident to her upper-back and chest.

Plaintiff's assertion that the accident impaired her general ability to lead her normal life is not supported by evidence in the record. Plaintiff's back and chest issues existed years before the accident. Plaintiff does not dispute that she also suffered from bladder issues, chest pain, knee pain, and low-back pain for years prior to the accident. For example, Plaintiff testified at her deposition that she has been suffering from low-back pain in her sciatic nerve since 2006. This low-back pain forced Plaintiff to try exercises, physical therapy, and injections from Dr. Lininger in order to deal with the pain. (Dkt. # 22-1, Pg. ID 134-135.) Plaintiff also has had ongoing bladder issues since 2014, which have required surgery. (Dkt. # 22-1, Pg. ID 136.) Plaintiff has suffered from knee pain for years prior to the accident and has torn her meniscus three times. (Dkt. # 22-1, Pg. ID 137-139.) All of Plaintiff's pre-accident medical issues are well documented and evinced by her medical records and numerous GM disability claims from 2006 to 2016. While the focus of the court's inquiry is on Plaintiff's prior impairments, Plaintiff's prior medical issues are relevant because they caused her prior impairments. They are indicative of Plaintiff's ability to lead her life prior to the accident, i.e., they are indicative of her normal life.

As a result of the accident, Plaintiff experienced injuries to her arms, back, and chest. She claims that these problems somehow impair her life differently or more severely than the injuries which she suffered before the accident. The court finds no support for Plaintiff's contention. Plaintiff was physically limited in her capabilities prior to the accident. For example, Plaintiff testified that she is unable to do any heavy lifting; however, she also had this limitation prior to the accident. In 2015, a year before the accident, Plaintiff was unable to lift or carry more than ten pounds, stand or walk for more than three hours, sit for more than three hours and had limitations pushing, pulling, climbing, bending, stooping, and reaching above her shoulders. (Dkt. # 22-7, Pg. ID 209.) Plaintiff does not dispute that she was living with these impairments prior to the accident.

These limitations impaired Plaintiff's ability to work; Plaintiff changed jobs at GM three times in the course of four years because she was having trouble physically keeping up with the pace of the work. (Dkt. #22-1, Pg. ID 123-125.) Her medical issues rendered her completely disabled and unable to work on several occasions for weeks at a time. Plaintiff's primary care physician, Dr. Stepanski, testified that Plaintiff has missed several months of work every year since at least 2013. (Dkt. # 32-1, Pg. ID 533.) In fact, Dr. Stepanski wrote medical notes explaining that Plaintiff could not work due to her physical impairments. (*See* Dkt. # 22-5, Pg. ID 191; Dkt. # 22-6, Pg. ID 197; Dkt. # 22-7, Pg. ID 207). At the time of the accident, Plaintiff was already on disability leave from work due to these previous impairments. (Dkt. # 32-1, Pg. ID 531.) She testified that she intended to seek extended disability leave two days prior to the accident for her knee issues. (Dkt. #22-1, Pg. ID 139.)

Perhaps the most compelling evidence that Plaintiff's current impairments existed before the accident is that Plaintiff visited Dr. Stepanski five hours prior to the accident to discuss her back and knee pain. (Dkt. #22-1, Pg. ID 143.) During the visit, Plaintiff "complain[ed] of back pain, [and] left knee pain" and informed Dr. Stepanski that she had upcoming "appointment[s] with her knee doctor and her back doctor and her bladder doctor." (Dkt. # 32-1, Pg. ID 531.) During this visit, Plaintiff's objective was to request a note from Dr. Stepanski so she could have her disability leave extended.

Following the accident in March of 2016, Plaintiff remained on disability leave from work until September 2016, but not exclusively for her injuries sustained in the accident; she was also recovering from bladder surgery. According to Dr. Stepanski, Plaintiff would have been out of work until September 2016 regardless of her injuries from the accident because she was recovering from the bladder surgery. (Dkt. # 32-1, Pg. ID 535.)

Plaintiff does not present any evidence to show how the injuries to her arms, chest, and back, which she sustained in the accident, affect her ability to lead her previous normal manner of living. Regarding impairments caused by her back issues, Plaintiff testified that approximately four months after the accident, her upper-back pain was one out of ten, and explained that such a pain score meant that she "wasn't in pain." (Dkt. # 22-1, Pg. ID 156.) The record reflects that Plaintiff's chest was not causing her any issues at this time either. (Dkt. # 22-15, Pg. ID 235.) Upon completion of her physical therapy program for her back and chest, Plaintiff's condition was reported as "fair to good." (Dkt. # 22-15, Pg. ID 235.) Plaintiff further testified that "[a]s long as there

is no heavy lifting, I can do everything," including bathing, cooking, dressing, driving, and housekeeping. (Dkt. # 22-1, Pg. ID 157.)

Plaintiff claims that she is now more limited at her assembly job, but her claim is contradicted by the evidence on record. Plaintiff has returned to full-time, and occasionally overtime, work on the door line, which requires her to stand all day. (Dkt. 22-1, Pg. ID 127.) The pace of work on the door line is faster than the pace of her last position on the box line. (Dkt. # 22-1, Pg. ID 128.) Plaintiff works from three in the afternoon until eleven at night, six days a week. (Dkt. # 22-1, Pg. ID 127.) Plaintiff testified that she is able to complete all of her job duties, and her medical conditions do not prevent her from doing so. (Dkt. #22-1, Pg. ID 167.) There is nothing in the record to suggest her ability to work on the door line is impaired in any way different than it was impaired before the accident. While Plaintiff testified that she is able to accomplish her work only because she consumes "an awful lot of aspirin," (Dkt. # 22-1, Pg. ID 167), this fact is immaterial because she was taking a pain medication, Hydrocodone, to accomplish similar work prior to the accident. (Dkt. # 22-1, Pg. ID 144.) Plaintiff is able to do all regular day-to-day tasks without assistance.

In Plaintiff's response to the motion for summary judgment, Plaintiff asserts for the first time that, prior to the accident, she was "a very active grandmother who took her two grandchildren bowling, to carnivals, and horseback riding." (Dkt. # 26, Pg. ID 297.) She claims she is "unable to do any of these activities." (Dkt. # 26, Pg. ID 297.) Plaintiff's deposition does not address this point and she has not submitted an affidavit or any other evidence to support this claim. Plaintiff's conclusory statements asserted for the first time in her summary judgment briefing cannot serve as evidence that the

accident has affected her ability to lead her normal life. Given the evidence in the record, the court concludes that Plaintiff's upper-back and chest injuries do not impair her daily life any more than it was impaired prior to the accident. In other words, they have not affected her normal manner of living.

Based on a comparison of Plaintiff's life before and after the accident, Plaintiff has not provided sufficient evidence to raise a genuine dispute regarding whether the impairments she sustained from the motor vehicle accident affect her ability to lead her normal life. Therefore, Plaintiff fails to raise a genuine dispute of material fact as to whether she has suffered a serious impairment of body function. The court will grant Defendant's motion for summary judgment as to Plaintiff's claim for noneconomic damages.

## IV. CONCLUSION

The FTCA waives the federal government's sovereign immunity as to state law negligence actions. The Michigan No-Fault Act does not permit a claim for economic damages arising out of the use or operation of a motor vehicle against a third-party vehicle insurer or owner such as Defendant and it abolished negligence claims for economic damages arising out of the use or operation of a motor vehicle. Therefore, Plaintiff cannot maintain a claim for economic damages.

In comparing Plaintiff's life before and after the accident, the court concludes that Plaintiff has failed to satisfy the third factor of the threshold to show a serious impairment of a body function because she has not shown that her injuries resulting from the car accident affect her general ability to lead her normal manner of living. Therefore, she has not raised a genuine dispute of material fact as to whether she has

suffered a serious impairment of body function and cannot maintain a claim for

noneconomic damages under the Michigan No-Fault Act. Accordingly,

IT IS ORDERED that Defendant's motion for summary judgment (Dkt. # 23) is

GRANTED.

s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated: August 22, 2018

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, August 22, 2018, by electronic and/or ordinary mail.

s/Lisa Wagner
Case Manager and Deputy Clerk
(810) 292-6522

C2Orders/17-11059.BARTOS.GrantSJ.kb6.aju.docx